CENTER FOR DISABILITY ACCESS
Amanda Seabock, Esq., SBN 289900
Chris Carson, Esq., SBN 280048
Dennis Price, Esq., SBN 279082
Christopher A. Seabock, Esq., SBN 279640
100 Pine St., Ste 1250
San Francisco, CA 94111
(858) 375-7385; (888) 422-5191 fax
ChrisS@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Andres Gomez**, <br> Plaintiff, <br> v. <br> **Kieu Hoang Winery, LLC**, a California Limited Liability; and Does 1-10, <br> Defendants. | Case No. 3:21-cv-09471-SI <br><br> **Plaintiff's Response to Order to Show Cause re: Subject Matter Jurisdiction** <br><br> Honorable Judge Susan Illston |

Plaintiff hereby responds to the Court's Order to Show Cause. In that Order, the Court raised issues of subject matter jurisdiction and compliance with General Order 56. This brief and Mr. Gomez' declaration address the subject matter jurisdiction issues. The GO 56 issue is addressed in the Declaration of Christopher A. Seabock, filed concurrently.

## I. Subject Matter Jurisdiction and Websites

The interaction between the Americans with Disabilities Act and websites is complicated, with various courts applying different tests determining when a denial of full and equal access to a website is discriminatory and when it is not. Martinez v. San Diego County Credit Union, 50 Cal.App.5th 1048, 1058 (4th Dist. 2020)(collecting disparate analyses of various courts applying the ADA to websites). The Ninth Circuit "test" was articulated in *Robles* suggesting that when there is a nexus to a physical place, the website is covered. Robles v. Domino's Pizza, LLC, 913 F.3d 898, 905 (9th Cir. 2019). However, the Ninth Circuit explicitly avoided the question of whether a business without a physical nexus would be covered. Id., at fn 6. California state courts have taken the same approach. Martinez, 50 Cal.App.5th at 1071 ("Because we have concluded Martinez's allegations were sufficient to satisfy the nexus standard, we do not reach the legal issue whether the ADA applies to websites even without a nexus to a physical place."); Thurston v. Midvale Corp., 39 Cal.App.5th 634, 642 (2nd Dist. 2019) ("At a minimum, Title III covers a website with a nexus to a physical place of public accommodation"); Id., at 604 ("[W]e need not consider here the wholly hypothetical question whether Title III governs a website unconnected to a physical place of public accommodation offering only purely Internet-based services or products"). To date, no Ninth Circuit or California Appellate court has issued an opinion about the application of the ADA to public accommodations that exist purely on the internet. The *Weyer* case, filed in 1999, is the closest on this topic. However, that case was analyzed in a very different internet world than we have today and the service offered was outside the scope of a publicly accessible business, as it concerned an employer health plan website. Weyer v. Twentieth Century Fox Film Corp, 198 F.3d 1104 (9th Cir. 2000).

This court's order cites to the interpretation of interpretation of *Robles* in *Langer v. Pep Boys*. While no doubt persuasive, *Pep Boys* misstates the breadth of

the holding of *Robles* which, while finding subject matter jurisdiction on the basis of a nexus, explicitly did not state this was a mandatory requirement, merely a fulfilled one. "We need not decide whether the ADA covers the websites or apps of a physical place of public accommodation where their inaccessibility does not impede access to the goods and services of a physical location." Robles, 913 F.3d at 905 fn 6. It should also be noted that *Pep Boys* was not a merits determination that the Pep Boys website was not related to a physical place, but rather a pleading specificity defect that was able to be cured.

## II. Policy vs. Architectural Barriers

This situation is further complicated in how a particular barrier is defined. The difference between an architectural barrier and a policy barrier is typically fairly clear in a physical construction case. If a ramp is built that exceeds the maximum slope, that is plainly an issue of construction and architecture rather than policy. Similarly, a decision to omit the requisite number of compliant parking spaces in a parking lot plainly falls within the construction barrier category. However, grey areas come into play if a parking lot is constructed in a way that is compliant, and then is allowed to fall into disrepair. Was the parking lot constructed to a sub-standard design? Or does the business not have a maintenance policy that takes into consideration accessibility? Grocery stores commonly have blocked aisles. Were the aisles constructed in a compliant fashion or were they too narrow from the start? Is there a policy to narrow the aisles with merchandise or simply a failure to keep the aisles clear and maintained? The definition is hazy. However, typically the distinction does not matter. A failure to construct an accessible facility is a violation of the ADA, and a failure to maintain is also a violation of the ADA. The manner in which the barrier came into existence may affect the scope of the injunctive and whether or

not the claim can be mooted by voluntary cessation but it is not material as to whether or not the court has jurisdiction.

### III. General Order 56 Site Inspections Explicitly Omit Policy Barriers.

The above notwithstanding, General Order 56 and the way in which the ADA covers websites does concern this issue. General Order 56, by its own text, applies only to construction barriers related to a physical place and specifically excludes programmatic or policy violations from the Site Inspection portion of the order. GO 56 (7)(a). Policies related to the physical business do not "relate to a physical location" and obviate the need for a site inspection. Common examples include things such as denying someone with a service dog entry to a grocery store or refusing assistance with goods on a high shelf. This is unquestionably related to a physical place of public accommodation, but the violation itself is agnostic of any specific physical location that needs inspection, as the concern is the policy not its manifestation.

Plaintiff and his counsel conduct site inspections on websites not infrequently, however there is often pushback on the propriety of the inspection and whether it is necessary or covered by General Order 56 from defendants. The issue is the way in which the violation is perceived. Digital barriers always have a policy component, and the allegations in this complaint are no different. Complaint ¶ 32. While design is nearly always intentional, it is rare that one sets out to build a non-compliant website out of malice. Often, there is even a stated design goal to have compliance that is simply too narrow in scope, failing to take into account what access actually entails. For example, a site may contain alt-text on photos for a screen reader but fails to take into consideration color contrast as the aesthetics of the site color scheme are given priority over access. These are intentional policy decisions amounting to discrimination.

Website violation cases are always about changing the design policy of the website. It is functionally irrelevant if a particular video has closed captioning added or a particular subpage of a website is rendered screen-reader compliant. Websites are constantly changing, sometimes daily, and it is necessary to change the design and quality control policy of the business to take into consideration access for future content. New videos need to be captioned at the time of uploading and reviewed to make sure they are working. Newly uploaded photos must have adequately descriptive alt-text. Color design schemes needs to be updated to ensure that accessibility is part of the design. These are not the sorts of things that are tangible. Defendants often agree that a violation implicates policy rather than construction. Others do not. Plaintiff has no quarrel with inspections even if he doesn't believe they are strictly required, as the site inspection can be productive to provide context for the policy change. But if a defendant is not receptive to holding the meeting, Plaintiff lacks the tools to force the issue.

While attempting to schedule the site inspection in the *Corro* case, cited by the Court, Plaintiff explained this position and the defendant agreed the matter was policy related. Given the allegations in the complaint alleging a policy issue, Plaintiff cannot now contend it is not. This is not a concession that the barrier, the non-compliant website, lacks a nexus to the physical place of public accommodation, it is a concession that the barrier is agnostic as to any physical place as the non-compliant website is a result of a digital access policy untethered to that physical place.

Here, the Court conflates the locus of the violation with the "physical place" language found in *Weyer* and *Robles*. As described above in the service dog example, even terrestrial policy barriers can be location-agnostic but still ADA violations. Digital barriers are no different. The "nexus" is not talismanic language from the Ninth Circuit. There is not a minimum contacts analysis, or

special degree of tie required for a website to be covered. The question is merely whether the website is an offered benefit of a covered entity. Applying *Weyer*, in *Robles* the Ninth Circuit found that because the defendant was a place of public accommodation then all of its offered benefits were also covered by the ADA. Robles, 913 F.3d 898, 905 ("The statute applies to services *of* a place of public accommodation, not services *in* a place of public accommodation")(emphasis in original). The website, a service of the covered entity, was thus covered by the ADA. Id. The nexus test simply asks if the website is one of the benefits of a place of public accommodation. This is also consistent with the recently articulated position of the Department of Justice. Department of Justice, *Justice Department Issues Web Accessibility Guidance Under the Americans with Disabilities Act*, https://www.justice.gov/opa/pr/justice-department-issues-web-accessibility-guidance-under-americans-disabilities-act (March 18, 2022).

      Here, the business is a public accommodation covered by the ADA, a winery. The website is a covered benefit of the public accommodation. That the barrier came about unrelated to a physical location (because it was designed offsite and through policies having nothing to do with the physical location) does not deprive the court of jurisdiction. It is merely a recognition that the policy that gave rise to the violation is not something subject to inspection. This is functionally no different than if a customer called a business and was denied equal services over the phone due to their disability. The issue would have no terrestrial tie to the physical business. There is no need to inspect the phone. But the denial of access would unquestionably be covered under the subject matter jurisdiction granted by Congress.

### IV. Factual Basis for Jurisdiction

The Court's order draws attention to Judge Alsup's order in *Gates*. There, Mr. Gomez was suing a real estate agency in the Bay Area that lacked accessible elements. That court dismissed Gomez's claim for failure to state a claim due to Gomez's statement that he would not physically visit the business.

This was in error. Not only was this legal error[1] and not supported by *Robles*, but it represents a rejection of both the Ninth Circuit position on tester standing and the Department of Justice position on accessibility of websites, which have been published since that decision. The DOJ has stated the importance of "understanding how to ensure that websites are accessible to people with disabilities." Department of Justice, *Justice Department Issues Web Accessibility Guidance Under the Americans with Disabilities Act*, https://www.justice.gov/opa/pr/justice-department-issues-web-accessibility-guidance-under-americans-disabilities-act (March 18, 2022). Going further, "[p]eople with disabilities deserve to have an equal opportunity to access the services, goods and programs provided by government and businesses, including when offered or communicated through websites." Id. In the full guidance, the DOJ explains that website compliance is necessary to ensure that communication with people with disabilities is as effective as communication with others. Department of Justice, *When the ADA Requires Web Content to be Accessible*, https://beta.ada.gov/web-guidance/#when-the-ada-requires-web-content-to-be-accessible (March 22, 2022). Website barriers are specifically called out as including poor color contrast, lack of text alternatives on images, inaccessible online forms, mouse-only navigation and lack of captions on videos. Department

---

[1] The *Gates* decision was not appealed for reasons unrelated to the merits of this particular order. However, it is not binding authority on this Court, which should not follow the lead of *Gates*, as the decision fails to comport with Ninth Circuit precedent on both standing and the breadth of the ADA.

of Justice, *Examples of Website Accessibility Barriers*, https://beta.ada.gov/web-guidance/#examples-of-website-accessibility-barriers. (March 22, 2022). The barriers complained of by Mr. Gomez are specifically included in this list.

To the extent any Ninth Circuit precedent can be interpreted as the ADA not applying to websites, DOJ has unequivocally stated this is incorrect and that the ADA "intended for the ADA to keep pace with rapidly changing technology of our times." Department of Justice, *Web Accessibility for People with Disabilities is a Priority for the Department of Justice,* https://beta.ada.gov/web-guidance/#web-accessibility-for-people-with-disabilities-is-a-priority-for-the-department-of-justice. (March 22, 2022). Agency deference is necessary when there is ambiguity in the statute and the Ninth Circuit in both *Weyer* and *Robles* recognized the lack of clarity in attempting to fashion a rule. The numerous various interpretation of application of ADA provisions to the internet demonstrates the lack of clarity. Given this, and the superseding language of the Department of Justice, agency deference is mandatory. Kisor v. Wilkie, 139 S.Ct. 2400, 2422 (2019) (explaining that *Auer* deference remains); Johnson v. Starbucks Corporation, 17-02454 WHA, 2019 WL 1427435, *3 (March 29, 2019) (J. Alsup) (applying *Auer* deference to agency interpretation of the ADA).

It is not necessary that an individual intend to visit the physical business in order to sue for lack of accessibility of the website. In fact, the seminal case on this issue in the Ninth Circuit, *Robles*, involved facts not terribly dissimilar. There the plaintiff had zero intention to visit the physical location of Domino's, but instead was utilizing the website to obtain benefits without ever intending to physically visit the store. Robles, 913 F.3d 898 at 902. It is a skewering of the "nexus" concept to suggest that a website need only be compliant and offer benefits to patrons who intend to physically visit the business. This effectively makes accessibility an illusion. The internet is a boon for people with disabilities, providing access to goods and services previously unavailable to them. In the

case of Mr. Gomez, the digital versions of the terrestrial services are the superior form as they can be read by his digital devices. It is simply immaterial if he has any intention to visit the physical location; all that matters is whether the benefit he wished to avail himself of was offered by a physical place of public accommodation. There, as here, it was. The suggestion that Mr. Gomez must intend to visit "as a customer" is *explicitly* rejected by *CREEC*. provides that "'any person who is being subjected to discrimination on the basis of disability' may bring suit." *C*.R. Educ. & Enf't Ctr. v. Hosp. Properties Tr., 867 F.3d 1093, 1102 (9th Cir. 2017). Further, his motivations for patronizing the website have no relevance whatsoever to his standing. Id. at 1101.

Nonetheless, the Court's indication that Mr. Gomez attested that "he did not have any present intention to visit the Napa Valley" [Dkt. 15 at 1:25] is a misstatement. Rather, Mr. Gomez attested that he did not have the present intention to visit the Sotheby's office in Napa Valley. Garcia v. Gates, 3:21-cv-07147-WHA (Dkt. 34-1 ¶ 11) (Feb 14, 2022). To the contrary, Mr. Gomez attests that he was in California, planning a wine tasting trip in northern California to visit family, and intended to visit the physical location of the winery, here. *See* Declaration of Andres Gomez, filed concurrently. However, Mr. Gomez was and remains deterred from doing so by the inability to access the associated website.

Thus, even if the Court requires the website be tied to a physical location, that standard is met here and there is subject matter jurisdiction.

## V. Conclusion

Plaintiff asks that the court vacate the order to show cause and direct that this matter continue through General Order 56.

Dated: April 8, 2022                     CENTER FOR DISABILITY ACCESS

By /s/ Christopher A. Seabock
Christopher A. Seabock
Attorney for Plaintiff